OWENS CORNING FIBERGLAS CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Charlotte Hammond, widow of Charles Hammond, Deceased, Appellee).

Fourth District (Industrial Commission Division)   No. 4—89—0705WC

Opinion filed June 14, 1990.

Costigan & Wollrab, P.C., of Bloomington (Guy C. Fraker, of counsel), for appellant.

James Walker, Ltd., of Bloomington, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Charlotte Hammond, filed an application for adjustment of claim under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.36 *et seq.*) seeking benefits for the death of her husband, Charles Hammond (decedent), due to his exposure to asbestos while employed by the respondent, Owens Corning Fiberglas Corporation. Prior to his death, the decedent had been awarded permanent partial disability benefits (PPD) for asbestosis, and the claimant had received a judgment following a jury trial on a loss of consortium action brought by her because of her husband's asbestosis.

After a hearing on the claimant's petition, the arbitrator found that the decedent was last exposed to the hazard of asbestos on April 2, 1971, but that the cause of action for this claim arose on the date of the decedent's death, August 22, 1984; that the decedent's average weekly wage was $168.46 based upon the decedent's annual earnings the year preceding his last day of exposure to the asbestos (1971), but that the claimant was entitled to benefits in the amount of $178.02 per week, the statutory minimum in effect at the time of the decedent's death; that the claimant was entitled to burial expenses in the amount of $1,750 and to the necessary and reasonable medical expenses in the amount of $14,390.04; and that the respondent was entitled to the following credits: $22,184.50 paid to the decedent during · his lifetime as compensation for his PPD for the occupational disease

of asbestosis; $11,009.39 and $11,052.42 paid to the claimant for her recovery in wrongful death actions; and $93,750 paid to the claimant for her recovery in a loss of consortium action brought by her during the decedent's lifetime. (We note that the figure of $93,750 is used by the Industrial Commission (Commission) in its order when referring to the claimant's loss of consortium proceeds, but that the circuit court used the figure of $93,000 in its order. It appears that the correct figure is the $93,750.) On review, the Commission determined that the claimant had an independent cause of action which arose on August 22, 1984, and that the credits claimed by the respondent were not credits, but were liens or claims for reimbursement as provided under section 5 of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.40), and that the Commission had no jurisdiction to consider these claims. In all other respects, the Commission affirmed the arbitrator's decision. The circuit court confirmed the Industrial Commission's decision, with the exception that the court found that the Commission did have jurisdiction to determine the respondent's claims for credit. Accordingly, the circuit court held that the respondent was entitled to credit for the $22,061.81 ($11,009.39 and $11,052.42) paid to the claimant for her recovery in the wrongful death actions, but that the respondent was not entitled to credit for the $22,154 paid as compensation to the decedent as PPD for his occupational disease of asbestosis or to credit for the $93,750 that the claimant received for her loss of consortium action during the decedent's lifetime. The respondent appeals.

On appeal, the respondent sets forth arguments on six issues in its brief; however, two of these issues (i.e., that the Commission did have jurisdiction to address the credits sought by the respondent, and that the date of the decedent's last exposure to the hazard of asbestos was April 2, 1971) need not be considered as these issues were determined in the respondent's favor by the circuit court and were expressly excluded in the respondent's notice of appeal. The remaining four issues to be considered are: (1) whether the claimant had an independent cause of action for benefits under the Workers' Occupational Diseases Act due to the decedent's death caused by his work-related exposure to asbestos, where, as here, the decedent received PPD during his lifetime for a claim for his work-related exposure to asbestos under the the Workers' Occupational Diseases Act; (2) whether the statute in effect on April 2, 1971, the date of the decedent's last exposure to the hazard which caused his occupational disease, is applicable, or whether the statute in effect on August 22, 1984, the date of the decedent's death, is applicable; (3) whether the statutory minimum

rate of compensation provided in the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.7(a)) is applicable to the Workers' Occupational Diseases Act; and (4) whether the circuit court erroneously denied the respondent credit for the claimant's recovery of $93,750 for her loss of consortium case.

At the hearing before the arbitrator, the claimant testified that she was 58 years of age; that she had been married to the decedent since June 1, 1946; that the decedent died on August 22, 1984; and that she has not remarried. During her marriage, the decedent worked at Union Asbestos and Rubber Company (UNARCO). However, the UNARCO plant was subsequently bought by the respondent, and in April of 1971, the decedent was working for the respondent.

In the early 1970's, the decedent was diagnosed as having asbestosis. The decedent left his employment with the respondent on April 2, 1971, and after being off work for a period of time, he subsequently worked as a truck driver for Joe Evans & Son Excavating, Inc. (Evans Excavating), where he worked until 1981. In the summer of 1984, the decedent was diagnosed as having cancer. After he was so diagnosed, the claimant was unable to eat, he became very weak and was almost bedfast, and he used a wheelchair. Until the decedent's death, he was in and out of Mennonite Hospital under the care of Dr. Conklin.

Bill Johnson testified that he had worked with the decedent at UNARCO and at the respondent's plant from the 1950's until the 1970's. According to Johnson, when the plant was run by UNARCO, asbestos was used in the manufacturing process, and he and the decedent worked in the asbestos dust. Even after the plant was sold to the respondent in 1970, asbestos was used in the operations, and the conditions in the plant remained the same until the decedent left work.

Marilyn Evans testified that she was the secretary and treasurer for Evans Excavating. She corroborated that the decedent worked for Evans Excavating during the 1970's and early 1980's, and that the decedent's last full year of employment was 1981. The decedent had never been terminated from his employment at Evans Excavating, but he never returned to work after 1981. In 1981, the decedent had worked only 19½ 40-hour weeks, because work was not always available and because of the decedent's illness. During the last year of the decedent's employment, his hourly wage as a truck driver was $12.67½ per hour, and his gross wage was $12,890.54. Marilyn further testified that the hourly wage for truck drivers who performed the same work as the decedent was $14.27 per hour in 1984.

In addition to the foregoing testimony, the claimant presented numerous documents which were admitted into evidence. These documents included the medical records from Mennonite Hospital; the evidence deposition of Dr. Conklin; the decedent's certificate of death and autopsy report; the decedent's medical and funeral bills; a check dated September 13, 1984, from the respondent and payable to the claimant for the decedent's compensation benefits for his occupational disease claim; and a copy of the claimant's motion for summary judgment and a certified copy of the circuit court's order in case number 80—L—52, entitled Charlotte Hammond v. North American Asbestos Corporation, entered October 21, 1983, and in which the respondent's motion for leave to intervene in the claimant's loss of consortium case was denied.

The pertinent facts obtained from the decedent's medical records, the certificate of death and the autopsy report were as follows: the decedent was 57 years of age at the time of his death and the cause of his death on August 22, 1984, was due primarily to "malignant mesothelioma of [the] peritoneum." The decedent had had a long-standing exposure to asbestos because of his occupation and had suffered interstitial pulmonary disease (asbestosis) for many years. The decedent had been followed for tumor formation, but it was not until a biopsy excision of a nodule in the decedent's abdomen was done in July of 1984 that the mesothelioma of the peritoneum was discovered.

Dr. Robert Conklin, in his evidence deposition of December 17, 1986, testified that he had practiced as a physician for 25 years, and that he restricted his practice to chest surgery. In the course of his practice, Dr. Conklin had seen approximately 250 patients whose condition of ill-being was associated with exposure to asbestos. According to Dr. Conklin, there are three diseases associated with the exposure to asbestos, these diseases being pulmonary asbestosis, which is a scarring of the lung (asbestosis); cancer of the lung; and mesothelioma of the pleural (lining of the lung cavity) mesothelium or the peritoneum (lining of the abdominal cavity) mesothelium. Dr. Conklin explained that some patients develop asbestosis, some develop lung cancer and some develop mesothelioma. Mesothelioma is a type of cancer and is usually fatal; however, the patients that develop mesothelioma are unusual, and only 5% to 10% of the people exposed to asbestos develop this disease. Dr. Conklin further explained that mesothelioma is a malignant tumor of the mesothelial cells, which are present both in the lining of the pleural space and in the lining of the peritoneum.

Dr. Conklin testified that asbestosis is a condition which develops over a period of time, usually years, from the deposition of the fibers

of the asbestos dust. In asbestosis, the asbestos fibers become embedded in the finer branches of the bronchial tree and cannot be expelled. Subsequently, with the respiratory movements, the asbestos fibers work into the tissues outside the bronchia and into the peribronchial tissues where the fibers seem to set up an inflammatory or fibrotic reaction which results in scar tissue formation. According to Dr. Conklin, asbestosis is an irreversible, progressive condition.

Dr. Conklin stated that pleural and peritoneum mesothelioma are also caused by exposure to asbestos. Dr. Conklin testified that in peritoneum mesothelioma, it is presumed that the asbestos fibers get into the abdominal lining when sputum is coughed by a person and some of the sputum that contains the asbestos dust is swallowed and goes into the bowel. There, the asbestos fibers behave in the intestinal mucosa as they do in the bronchial lining, and the result is a similar irritation of the covering of the bowel. According to Dr. Conklin, not everyone who develops asbestosis develops mesothelioma, and it is not necessary to have asbestosis to have mesothelioma. Mesothelioma is not caused by smoking, and the prevalent opinion is that the only apparent cause of mesothelioma is exposure to asbestos. Dr. Conklin stated that asbestosis and mesothelioma are two separate diseases, but both are caused by exposure to asbestos.

Dr. Conklin first saw the decedent in April 1971, at the Mennonite Hospital as a consultation with Dr. McGinnes. The decedent was hospitalized by Dr. McGinnes on April 22, 1971, because the decedent had had a cough of six weeks' duration, had had chest pain for 8 to 10 months' duration, and had had shortness of breath of increasing severity for five years. At the time of Dr. Conklin's first visit with the decedent, the decedent's occupational history was that he had worked for 17 years as a foreman in a factory where he was exposed to large quantities of asbestos dust. In addition, the decedent had smoked over a pack of cigarettes every day for 28 years. In July 1972, Dr. Conklin diagnosed the decedent's condition as generalized pulmonary fibrosis due to asbestosis.

Dr. Conklin continued to treat the decedent from 1971 until 1984, and in May 1984, the decedent complained of constipation and had developed a right inguinal hernia. In July of 1984, the decedent continued to lose weight, had developed an abdominal wall mass and had evidence of ascites (fluid in the abdomen). It was Dr. Conklin who had had the decedent admitted to Mennonite Hospital on July 10, 1984. On July 17, 1984, Dr. Conklin excised the abdominal wall mass and drained 1,600 milliliters of serous peritoneal fluid from the decedent's abdomen.

Dr. Conklin testified that a buildup of fluid is associated with the disease of mesothelioma. The report of the pathologist following the decedent's surgery indicated that the abdominal mass was a malignant tumor consistent with malignant mesothelioma. From this information, Dr. Conklin determined that the decedent had peritoneal mesothelioma, and that at the time of the discovery of the disease, the mesothelioma was well advanced. When questioned about the rate that mesothelioma progresses, Dr. Conklin responded that it progressed at variable rates. Although Dr. Conklin could not determine how long the decedent had had the mesothelioma, it appeared that the rate of progression of the decedent's mesothelioma was quite rapid due to the short time from the time of its discovery in July of 1984 until the decedent's death in August of 1984.

Dr. Conklin described how mesothelioma progresses. He stated that mesothelioma thickens the bowel wall such that peristalsis of the intestines is ineffective. After that, constipation and an inability to eat develop. In addition, protein-rich fluid forms in the peritoneum and this saps the body of nutrition and accelerates debilitation and death. In effect, a person wastes away.

In Dr. Conklin's opinion, the mesothelioma was the primary cause of the decedent's death. Dr. Conklin stated that the latency period (the time from the first exposure until the first symptoms arise) for mesothelioma is quite variable and the latency period can be as long as 40 years where exposure to the asbestos is light. The rate at which mesothelioma develops in a person depends on the amount of asbestos to which the person is exposed and the individual's susceptibility. Therefore, even though it was 13 years from the decedent's last exposure to asbestos until the mesothelioma was diagnosed, this time period had no effect on the causal connection between the exposure to the asbestos and the development of the mesothelioma.

The respondent presented no testimony, but introduced several documents into evidence. The documents submitted by the respondent consisted of the circuit court's order regarding the occupational diseases claim for asbestosis filed by the decedent with the Industrial Commission and the supreme court's decision in the appeal therefrom; an affidavit of the respondent's insurer in which a schedule of the disability payments paid to the decedent was given; the complaint filed on March 13, 1980, and the supreme court decision in the claimant's loss of consortium case (case number 80—L—52); the claimant's release of judgment in her loss of consortium case; and documents reflecting the claimant's partial recovery in case number 86—L—128 (the wrongful death action filed by the claimant). No additional evi-

dence was presented at the review hearing before the Industrial Commission.

We first consider the respondent's contention that the Industrial Commission erroneously determined that the claimant had an independent cause of action for her husband's work-related death under the Workers' Occupational Diseases Act. The respondent argues that the Industrial Commission and the circuit court erroneously relied on and extended the ruling set forth in *A.O. Smith Corp. v. Industrial Comm'n* (1985), 109 Ill. 2d 52, 485 N.E.2d 335, a case in which the widow was found to have an independent cause of action for death benefits under the Workers' Compensation Act, even though her deceased husband had received disability payments during his lifetime. The respondent contends that while the court's ruling in *A.O. Smith Corp.* was based upon the distinctions of the language of "fatal cases" and "non-fatal cases" found in sections 7 and 8 of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, pars. 138.7, 138.8), the respondent asserts that provisions similar to sections 7 and 8 of the Workers' Compensation Act do not appear in the Workers' Occupational Diseases Act. From this, the respondent concludes that section 7 of the Workers' Occupational Diseases Act is controlling. (Ill. Rev. Stat. 1983, ch. 48, par. 172.42.) The respondent asserts that section 7 of the Workers' Occupational Diseases Act does not specifically provide for a widow's separate cause of action, but that that section states that the employee's dependents share the same cause of action as the employee. Without elaborating, except to point out that sections 7 and 8 of the Workers' Compensation Act are different from section 7 of the Workers' Occupational Diseases Act, it appears that the respondent is asking this court to make a tortured interpretation of section 7 of the Workers' Occupational Diseases Act, and to find that a widow has no independent cause of action for death benefits under the Workers' Occupational Diseases Act. However, both the case law and the rules of statutory construction would mandate against such a finding.

■ In construing a statute, it is a primary rule of construction that a court is to ascertain and give effect to the true intent and meaning of the legislature. (*Stewart v. Industrial Comm'n* (1987), 115 Ill. 2d 337, 504 N.E.2d 84; *Patton v. Industrial Comm'n* (1986), 147 Ill. App. 3d 738, 498 N.E.2d 539.) To determine the legislative intent, a court must first consider the language of the statute itself, and if the language is clear, the statute will be given effect without resorting to other aids. (*Patton*, 147 Ill. App. 3d 738, 498 N.E.2d 539.) We find that the language of section 7 of the Workers' Occupational Dis-

eases Act is clear on its face, and that the legislature intended a spouse to have an independent cause of action for death benefits in those cases where the employee died as a result of a work-related occupational disease.

Section 7 of the Workers' Occupational Diseases Act provides in pertinent part as follows:

"If any employee sustains any disablement, impairment, or disfigurement, or dies and his or her disability, impairment, disfigurement or death is caused by a disease aggravated by an exposure of the employment or by an occupational disease arising out of and in the course of his or her employment, such employee or such employee's dependents, as the case may be, shall be entitled to compensation, medical, surgical, hospital and rehabilitation care, prosthesis, burial costs, and all other benefits, rights and remedies, in the same manner, to the same extent and subject to the same terms, conditions and limitations, except as herein otherwise provided, as are now or may hereafter be provided by the 'Workers' Compensation Act' for accidental injuries sustained by employees arising out of and in the course of their employment *** and for this purpose the disablement, disfigurement or death of an employee by reason of an occupational disease, arising out of and in the course of his or her employment, shall be treated as the happening of an accidental injury." Ill. Rev. Stat. 1983, ch. 48, par. 172.42.

■■ From the language of the foregoing statute, the legislature provided that either the "employee *or* the employee's dependents, *as the case may be,*" is entitled to all of the benefits provided by the Workers' Compensation Act. The use of the word "or" in this phrase is disjunctive, which implies that a separate cause of action can be maintained for either the employee himself or for his dependents, or for both, and depending on who has brought the cause of action, either is entitled to all of the benefits provided for in the Workers' Compensation Act. Additionally, the respondent does not dispute a dependent's right to death benefits under the Workers' Compensation Act, and since an employee suffering from an occupational disease and an employee's dependents are entitled to all of the benefits of the Workers' Compensation Act, then, under section 7 of the Workers' Occupational Diseases Act, the claimant here had an independent cause of action for death benefits that was separate and distinct from the decedent's claim for disability benefits which was brought during his lifetime, and this would be so regardless of whether the decedent's disability benefits for PPD were received for the same occupational

disease or a different occupational disease that caused his death. (See *A.O. Smith Corp.*, 109 Ill. 2d 52, 485 N.E.2d 335; *General American Life Insurance Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 359, 454 N.E.2d 643.) That the claimant here had an independent cause of action for the death benefits separate from the decedent's disability benefits is reinforced by the fact that the decedent's disability claim brought during his lifetime was for asbestosis, while the claimant's claim for death benefits was for the decedent's death due to mesothelioma. According to the record presented in this case, both the asbestosis and the mesothelioma were separate diseases which were caused by an exposure to asbestos. Therefore, the Industrial Commission and the court were correct when they determined that the claimant had an independent cause of action for death benefits.

The next issue raised by the respondent is that the statute at the date of the decedent's day of last exposure to the asbestos (1971), rather than the statute that was in effect at the time of the decedent's death (1984), is the statute which should have been applied in this case to determine the claimant's substantive rights. It is clear that if the 1971 statute were applied in this case, the substantive rights of the parties would be greatly affected, due to the 13-year difference between the date of the decedent's last exposure to the asbestos and his death. The respondent claims that the 1971 statute should have been applied as the date of last exposure is synonymous with the date of injury.

Again, the language of the statute and the case law are dispositive of this issue. Section 7 of the Workers' Occupational Diseases Act states that the "disablement, disfigurement or death of an employee by reason of an occupational disease \*\*\* shall be treated as the happening of an occupational injury." (Ill. Rev. Stat. 1983, ch. 48, par. 172.42.) If the legislature had intended the date of last exposure to the hazard of an occupational disease to be the date of the injury, it would have so stated, as it used the phrase "day of last exposure" in other portions of the statute.

■ In addition, the case law has held that the date of injury in a death-benefit claim is the date of the employee's death as this is when the injury occurred to the employee's dependents. (*A.O. Smith Corp.*, 109 Ill. 2d 52, 485 N.E.2d 335.) Further, it is the date of the injury which determines which statute is to be applied in awarding benefits. (*A.O. Smith Corp.*, 109 Ill. 2d 52, 485 N.E.2d 335; *Grigsby v. Industrial Comm'n* (1979), 76 Ill. 2d 528, 394 N.E.2d 1173.) Thus, since the date of the claimant's injury was the date of the decedent's death, August 22, 1984, the Commission properly applied the 1984 statute in

determining the claimant's benefits.

The respondent's third issue is that the Workers' Occupational Diseases Act does not provide for a "fictitious minimum rate," and that the Commission erred when it applied the minimum rate schedule found in sections 7 and 8 of the Workers' Compensation Act. The respondent argues that section 10 of the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1983, ch. 48, par. 172.45) takes precedence over sections 7 and 8 of the Workers' Compensation Act, and that section 10 is dispositive as to the rate of compensation to which the claimant is entitled. Again, the respondent's reading of the statute is misplaced.

Section 10 of the Workers' Occupational Diseases Act provides the formula for computing the employee's average weekly wage, but it is sections 7 and 8 of the Workers' Compensation Act which determine the rate of compensation to be awarded after this calculation is made. In section 10 of the Workers' Occupational Diseases Act, it is stated that the average weekly wage of an employee shall be computed on the annual earnings of the disabled person for his continuous employment with the same employer for the "year next preceding the day of last exposure." (Ill. Rev. Stat. 1983, ch. 48, par. 172.45.) Here, the Commission properly applied the formula provided in section 10, and determined that the decedent's average weekly wage was $168.46 based on the decedent's annual earnings for the year preceding April 2, 1971. If, as the respondent argues, section 10 is totally dispositive of the rate of compensation to be paid the claimant, then no further calculation would be necessary and the weekly benefits to which the claimant would be entitled would be $168.46.

■ However, a review of the Workers' Occupational Diseases Act and the Workers' Compensation Act reveals that section 10 of the Workers' Occupational Diseases Act is comparable to section 10 of the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.10), in that both of these sections only provide the method of determining the employee's average weekly wage which forms the basis for the further computation of the rate of compensation. After the average weekly wage is computed, section 10 in each of the Acts ultimately refers back, either directly or indirectly, to sections 7 and 8 of the Workers' Compensation Act for the determination of the rate of compensation to be paid a claimant. Section 10 of the Workers' Occupational Diseases Act refers to sections 7 and 8 of the Workers' Occupational Diseases Act, and section 7 of the Workers' Occupational Diseases Act states that a claimant is entitled to all compensation provided under the Workers' Compensation Act, thereby indirectly in-

corporating sections 7 and 8 of the Workers' Compensation Act. Since we have previously concluded that the 1984 statute applied to determine the claimant's rate of compensation, the Commission properly applied the statutory minimum rate of compensation provided in these sections in the Workers' Compensation Act at that time.

■ The last issue of the respondent to be considered is that the circuit court erroneously denied it credit for the $93,750 received by the claimant for her loss of consortium claim brought by her in 1980 against the North American Asbestos Corp. for her injury caused by her husband's asbestosis. The respondent also mentions that it is entitled to credit for the disability payments paid to the decedent during his lifetime; however, it is unclear whether the respondent is seeking review of this point. The respondent appears to concede in its brief that it is not entitled to credit for the PPD paid to the decedent, but, after seemingly conceding this point, the respondent states that the claimant's death benefits should be reduced by the amount of the PPD paid to the decedent during his lifetime. In any event, the respondent failed to comply with Supreme Court Rule 341(e)(7) (107 Ill. 2d R. 341(e)(7)) on this point as it did not support this bare allegation with citation to any authority or with an argument. Because the respondent failed to comply with Supreme Court Rule 341(e)(7), this court need not consider whether the respondent was entitled to credit for the PPD payments made to the decedent during his lifetime (*Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605, 505 N.E.2d 387), and we need only consider the respondent's claim for credit for the claimant's loss of consortium proceeds.

■■ The respondent contends that it is entitled to credit for the claimant's proceeds pursuant to section 5(b) of the Workers' Occupational Diseases Act. (Ill. Rev. Stat. 1983, ch. 48, par. 172.40(b).) Section 5(b) states in pertinent part as follows:

"Where the disablement or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under the Act. In such case, however, if the action against such other person is brought by the disabled employee or his personal representative and judgment is obtained and paid or settlement is made with such other person, either with or without suit, then from the amount received by such employee or personal representative there shall be paid to the

employer the amount of compensation paid or to be paid by him to such employee or personal representative, including amounts paid or to be paid pursuant to paragraph (a) of Section 8 of this Act.

\* \* \*

If the disabled employee or his personal representative agrees to receive compensation from the employer or accept from the employer any payment on account of such compensation, or to institute proceedings to recover the same, the employer may have or claim a lien upon any award, judgment or fund out of which such employee might be compensated from such third party." (Ill. Rev. Stat. 1983, ch. 48, par. 172.40(b).)

It is plain from the language of section 5(b) that only the proceeds from a third-party action brought by the employee or the employee's personal representative are subject to reimbursement by the employer for compensation payments paid. Here, the proceeds against which the employer seeks reimbursement were neither paid to the employee nor to his personal representative as the claimant's loss of consortium action was brought in her own behalf, just as her claim for death benefits was likewise brought in her own behalf. Because the proceeds the claimant received were not obtained for the employee or the employee's personal representative, no lien or claim for reimbursement for the claimant's loss of consortium proceeds could attach on the employer's behalf under section 5(b), and the circuit court properly denied the respondent credit. See *Page v. Hibbard* (1987), 119 Ill. 2d 41, 518 N.E.2d 69; *Dillon v. Nathan* (1956), 10 Ill. App. 2d 289, 135 N.E.2d 136.

For the foregoing reasons, the judgment of the circuit court of McLean County is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.